UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

|  |  |  |
|---|---|---|
| BRADFORD ROSS, # 204607, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:10-cv-288 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| KENNETH McKEE, | ) | |
| | ) | **OPINION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. An Emmet County Circuit Court jury convicted petitioner of second-degree murder for the killing of Timothy Harrington; the jury acquitted him of first-degree murder. The trial court judge summarized the events giving rise to petitioner's conviction as follows:

> Defendant beat his roommate to death with a baseball bat on January 17, 2005. At trial, he claimed that he acted in self defense or that the killing was committed in the heat of passion.
>
> * * *
>
> Defendant admits killing the victim. The crime occurred in defendant's home. The victim was his roommate. Both of them were drinking at a bar earlier. The victim was highly intoxicated. Defendant says he had just three beers and was not intoxicated.
>
> The victim was ejected from the bar for his offensive, drunken conduct towards other patrons. Defendant left with him, and once outside, Defendant says the victim hit him and gave him a bloody nose. They then walked together the short distance to Defendant's house. Once inside, Defendant cleaned up his bloody nose in the bathroom and then headed for his bedroom.

On the way, he encountered the victim again in the living room. He says the victim pushed him down, and then came at him with a baseball bat. Defendant was able to grab the bat, and he swung it and hit the victim, knocking him down to the couch. Then, defendant says the victim got up, and Defendant hit him again. Defendant claimed not to remember exactly how many additional blows were struck, but admits the victim was dead afterwards.

Defendant then spent some time attempting to clean up the house. The next morning, his friend, Jeff Berry, arrived to drive him to work. Berry came into the house and Defendant told him what had happened. They consumed some beer, and then took the bat in Berry's van and disposed of it in a river in a remote location. Afterwards, they drove around for some time and consumed more beer.

Berry then dropped Defendant off at his house with the plan that Defendant would clean up the house further, wrap up the body, and Berry would return so that they could take the body somewhere to dispose of it. After they parted, Barry apparently decided to discontinue participating in the cover up, and instead he called the police.

When the police arrived at Defendant's house they found the body wrapped in plastic, a tarp, and duct tape. An autopsy of the victim was performed by Dr. David Start, a forensic pathologist. Dr. Start testified that the victim had injuries to both forearms which were consistent with "defensive type injuries." He also testified that the victim suffered multiple blows to the head, which resulted in multiple skull fractures and injury to the brain. He testified that there were at least five skull fractures. He could not say exactly how many blows were struck, he did state that "there [were] more than four."

(1/14/09 Op., 1, 5-6, found in Michigan Court of Appeals record, ECF No. 25).

Petitioner was sentenced to 40-to-60 years' imprisonment. After unsuccessful efforts to overturn his conviction and sentence in the Michigan courts, petitioner brought this habeas corpus proceeding. Petitioner seeks relief on the following grounds:

I.    The evidence was insufficient to support the jury's verdict finding petitioner guilty beyond a reasonable doubt of second-degree-murder.

II.     The prosecutor withheld evidence of bloodstains on the kitchen floor in violation of petitioner's rights under the Fourteenth Amendment's Due Process Clause.

III.    Petitioner's rights under the 5th and 14th Amendment were violated when the police questioned him after he requested counsel.

IV.     Destruction of a police officer's notes violated petitioner's rights under the Fourteenth Amendment's Due Process Clause.

V.      Petitioner's trial counsel was ineffective because he failed to hire a pathologist or private investigator, failed to object to a portion of the prosecutor's closing argument, failed to move to dismiss the bindover on the first-degree murder charge, and failed to move for a change of venue.

VI.     Grounds petitioner raised in his Rule 6.500 motion seeking post-conviction relief

        A.     Destruction of exculpatory evidence deprived petitioner of the opportunity to present a defense and enabled the prosecution to mislead the jury and obtain a conviction in violation of petitioner's rights under the Fourteenth Amendment's Due Process Clause.

        B.     Prosecutorial misconduct in the knowing use of perjured testimony violated petitioner's rights under the Fourteenth Amendment's Due Process Clause.

        C.     Prosecutorial misconduct in paying Mr. Berry and allowing him to enter petitioner's home and remove exculpatory evidence.

        D.     Prosecutorial misconduct in violating Rule 803(5) of the Michigan Rules of Evidence and an abuse of the trial court's discretion in allowing hearsay denied petitioner a fair trial in violation of his Fourteenth Amendment rights.

        E.     Prosecutorial Misconduct in eliciting testimony regarding petitioner's time at a treatment center deprived petitioner of a fair trial in violation of his Fourteenth Amendment rights.

        F.     The trial court committed instructional error by not giving a cautionary instruction concerning the testimony of an accomplice.

G.     Ineffective assistance of trial counsel in failing to subject the state's evidence to meaningful adversarial testing.  Ineffective assistance of appellate counsel in failure to raise the issues on direct appeal the petitioner later raised in his 6.500  motion.

H.     The cumulative effect of errors deprived petitioner of a fair trial.

(Am. Pet. at 6-10C, ECF No. 7, PageID.58-64).

All grounds that petitioner raised on direct appeal (Grounds I-V) were rejected by the Michigan Court of Appeals for lack of merit.  The grounds that petitioner raised in his Rule 6.500 motion were generally rejected because petitioner had not shown good cause for failure to raise the issues in his direct appeal.  The issues that appeared in petitioner's Rule 6.500 motion that had already been raised and rejected by the Michigan Court of Appeals were denied on that basis.  Respondent argues that Grounds I and V should be denied for lack of merit, and that all other grounds raised by petitioner are barred by procedural defaults, not overcome by showings of cause and prejudice or actual innocence.  (Answer, ECF No. 12).

Upon review, the Court finds that the grounds raised by petitioner are without merit.[1]  A judgment will be entered dismissing the petition with prejudice.

---

[1]Both the Supreme Court and the Sixth Circuit have indicated that this Court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Bales v. Bell*, 788 F.3d 568, 573 (6th Cir. 2015); *Scott v. Houk*, 760 F.3d 497, 506 (6th Cir. 2014).  In the present case, the grounds raised by petitioner are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

## Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), govern the scope of the Court's review of this matter. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011) (*per curiam*); *Renrico v. Lett*, 559 U.S. 766, 773 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). Section 2254(e)(1) states: "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)). AEDPA prevents federal

habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see Burt v. Titlow*, 134 S. Ct. 10, 16 (2013); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786-87 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Section 2254(d) reflects that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014); *Davis v. Ayala*, 135 S. Ct. at 2198.

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings—not dicta—of Supreme Court decisions. *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court."). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Section 2254(d)(2) requires that this Court accord the state trial court substantial deference.  If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination.  *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. at 15.

## <u>Findings of Fact</u>

### A.    Preliminary Examination

Petitioner received a preliminary examination in the 90th Judicial District Court for Emmet County.  (Preliminary Exam, ECF No. 15-16).  The court heard testimony from multiple witnesses over the course of the two-day hearing.  Bryan Klawuhn was petitioner's appointed counsel.  Attorney Klawuhn represented petitioner during the main portion of the preliminary examination hearing, which was conducted on February 18, 2005.  (ECF No. 15).  Attorney Joseph Kwiatkowski, a friend of petitioner's father, had agreed to provide assistance to Attorney Klawuhn.  Attorney Kwiatkowski acted on a *pro bono* basis and filed an appearance as co-counsel in the district court. The only witness at the continuation of the preliminary examination on March 4, 2005, was David Start, M.D.  Attorney Kwiatkowski represented petitioner during this portion of the preliminary examination.  (ECF No. 16).  On March 4, 2005, the district judge

found that there was sufficient evidence of premeditation to bind over petitioner on the charge of first-degree murder for killing Timothy Harrington.

### B. Circuit Court Proceedings

On March 29, 2005, Emmet County Circuit Court Judge Charles Johnson conducted a hearing on petitioner's attorney's motion (Hearing Transcript (HT), ECF No. 17). Petitioner was represented at this hearing and at trial by Attorney Klawuhn.[2] Attorney Klawuhn already had an investigator named Gary Robins going out and interviewing witnesses who knew petitioner and Timothy Harrington or may have seen them at area bars. (HT, 6). Attorney Klawuhn indicated that he was going to continue with Mr. Robins as his investigator regardless of whether Judge Johnson approved of additional funds for the investigator's services. (HT, 11). Judge Johnson did not rule out the possibility that funds for the private investigator's services might be approved at sometime in the future. He noted that petitioner's attorney was going to proceed with Mr. Robins as an investigator regardless of the court's ruling. (HT, 13).

---

[2]Attorney Kwiatkowski did not represent petitioner in Emmet County Circuit Court proceedings. After petitioner was convicted and sentenced, petitioner filed complaints with the Attorney Grievance Commission. These documents (ECF No. 25) indicate that Attorney Kwiatkowski explained to petitioner that he was merely acting as *pro bono* counsel assisting Attorney Klawuhn in preparing for this first-degree murder case and that Attorney Klawuhn was lead counsel. After the preliminary examination and bindover for trial it became apparent that the best defense available to petitioner would not turn on expert testimony regarding the manner of death. It would be based on mutual combat and/or lack of premeditation or deliberation. Attorney Kwiatkowski believes that petitioner received exemplary representation by Attorney Klawuhn, as evidenced by the jury's verdict finding him not guilty of the greater charge of first-degree murder, even though the evidence showed that petitioner beat the victim to death with a baseball bat and had made a confession.

Attorney Klawuhn recognized that petitioner's state of mind on the night in question would be critical: "The issue is not whether a death occurred, not necessarily an issue who caused the death to occur, but the issue is going to come down to was it a premeditated offense, voluntary manslaughter, or something else." (HT, 5). He also noted that although there was a possibility that the second pathologist's opinion might not necessarily be helpful to petitioner, he wanted to pursue inquiry into areas where pathologists might reasonably disagree. (HT, 5). Attorney Klawuhn convinced Judge Johnson to approve funds for the hiring of a pathologist. If, after the pathologist reviewed the evidence, and if it was apparent to petitioner's attorney that this pathologist's testimony was needed at trial, the attorney could file a motion with the court requesting additional funds. (HT, 12-16).

Petitioner's trial began on August 22, 2005, and it concluded on August 24, 2005, with the jury's verdict finding petitioner guilty of the lesser charge of second-degree murder. (TT I-III, ECF No. 18-20). The evidence that petitioner killed Timothy Harrington was overwhelming. Among other things, petitioner had provided a statement to the police minutes after they arrived and found him with Harrington's body, which had been wrapped in plastic. Petitioner's counsel adopted that statement in arguing for acquittal on the basis of self-defense, or, in the alternative, a voluntary manslaughter conviction based on the sudden-heat-of-passion defense. (TT I, 167-81; TT III, 112-32, 148-55).

Timothy Harrington died of massive head injuries. (TT II, 10-11, 19-20). He had large lacerations or tearing of his scalp on both sides of the skull and underlying fractures caused by multiple blunt force injuries. (TT III, 12-15). He also had multiple fractures at the base of the skull. (TT III, 16-18). Considering the strength and density of scull bones, a significant amount of force was required to cause the fractures at the base, top, and sides of the scull. (TT III, 17-18). More than four blows to the head would have been required to inflict the combination skull fractures and skin lacerations found on Harrington's head. (TT III, 20, 36).

Harrington also had significant injuries on his arms and hand, including a left ulnar fracture. (TT III, 9-10). Harrington did not suffer any other significant injuries. (TT III, 10-11). The injuries to Harrington's forearms and hand were consistent with injuries that would be sustained by an individual attempting to defend himself from an attack with a blunt object. (TT III, 15).

The initial fracture of Harrington's skull would have rendered him unconscious. He did not die instantly. The blood found in his lungs indicated that he continued to breathe, but his breathing would have been unusual and could have included coughing and gurgling noises. (TT III, 23-24, 27). Harrington had a .23 blood-alcohol level. (TT III, 22, 28).

Police found Harrington's body at the Petoskey residence that he and petitioner had shared. (TT I, 189-90, 193-94). Harrington's body was in front of the couch on the living room floor. It had been wrapped in plastic and a tarp secured with duct tape. (TT

I, 193-96).  Petitioner's fingerprints were on the duct tape holding the tarp in place around Harrington's body.  (TT II, 162, 166).  Petitioner's left footprint was found on the plastic sheet under the tarp.  (TT II, 163, 166).

There were no obvious signs of a fight.  Nothing was broken.  The Christmas tree was upright, and a television and electronic equipment were found intact.  (TT II, 142-43).  What appeared to be blood was found on the walls in the living room.  (TT II, 143).  There was blood on the arm rest and back rest of the couch.  (TT II, 134).  The combination of the high volume of blood, the pooling of the blood, and the hair found on the couch indicated that it was "most likely where an altercation took place."  (TT II, 143).  The pooled blood stains on the couch were in the area below the cushion.  (TT I, 208; TT II, 140).  This indicated that "there was a source of blood that had been there for some time."  (TT II, 142).

A large, burned charcoal mass was found in the fireplace.  (TT I, 201-02, 207; TT II, 139).  A bucket was found in the bathtub and it appeared that it may have been used in an attempt to clean up after Harrington was killed.  (TT I, 203).  The clothes dryer was located in the bathroom, and it had what appeared to be blood on top of it.  (TT I 203; TT II, 135).  There were apparent blood stains on the kitchen counter and cabinet.  (TT I, 203-04; TT II, 135-36).

Police were contacted by petitioner's best friend, Jeff Berry.  Berry called 911 and indicated that he wanted to report a crime involving someone's death.  (TT II, 184).  Based on the information from Berry, police went to the residence that Harrington and

petitioner shared.  (TT I, 188).  Petitioner came outside and walked up the driveway to where the police were parked.  Petitioner was placed in handcuffs and advised of his *Miranda* rights.  (TT I, 188-191; TT II, 25).  When petitioner was asked whether there was anyone else in the house, his response was just the body.  (TT I, 191; TT II, 25).

Officer David Schultz of the Petoskey Department of Public Safety testified that when petitioner was secured in his police car he turned on the camera in order to record whatever petitioner might say.  (TT II, 26).  The tape was played during trial pursuant to a stipulation.  (TT II, 27-28).

Officer Schultz again advised petitioner of his *Miranda* rights at the police station.  Petitioner's handcuffs had been removed and he was seated in the jail's day room.  (TT II, 28-29).  Officer Schultz asked petitioner to take him through what had happened.

According to Officer Schultz, petitioner reported that, after he and Harrington left the bar, they walked over to an area near the Glens' market.  Harrington then turned around and punched petitioner in the face.  Petitioner indicated that his nose was bleeding.  He stated that he held his hand over his nose and that Harrington would not shut up as they walked the remaining distance to their residence.  Petitioner reported that he was the first to arrive at the residence, and that he went into the bathroom to tend to his bloody nose.  Petitioner related that when he left the bathroom, he found Harrington seated on the couch, and it appeared that he was ready to pass out.  Petitioner reported that he made a cell phone call to Jeff Berry or Berry's wife about

-13-

kicking Harrington out; petitioner thought that Harrington overheard the conversation. Petitioner claimed that Harrington shoved him against a wall and was rambling on about not being kicked out. Harrington grabbed a bat and took a swing at petitioner, but given Harrington's state of intoxication, petitioner was able to take the bat from him. Petitioner stated that he took the bat and cracked Harrington in the head. Petitioner indicated that he remembered Harrington putting his hands in front of him for the first blow, then falling back into the couch. Petitioner indicated that he was shocked and amazed when Harrington got up again and came towards him. Petitioner indicated that he lost it and started hitting Harrington. He indicated that he could not remember the number of times that he hit Harrington or whether he was moving at the time the blows were delivered. Petitioner claimed that he started cleaning up the mess because the police were not going to believe him. Petitioner described how he moved Harrington's body from the couch to a sheet of plastic on the floor. Petitioner took a shower, tried to clean his clothes, and was working on cleaning the walls and floor. (TT II, 30-37).

Jeff Berry's involvement began in the morning when he showed up at the residence to take petitioner to work. Petitioner showed Berry the body. The two men drank beers and petitioner indicated to Berry that he needed Berry's help in disposing of the bat. Petitioner described how he wrapped the bat in the towels that he had been using for cleaning and took the bat out to Berry's van. Berry drove over to the Wolverine area where they disposed of the aluminum bat by throwing it into a river.

They disposed of the cleaning towels or rags at a separate location.  Petitioner consented to allowing the police to seize his clothing, which was exchanged for an orange jump suit.  Officer Schultz was able to observe petitioner and he saw no bruises, scrapes, or other evidence of petitioner being involved in a physical confrontation beyond the damage to his nose.  Schultz was looking for those marks because petitioner had claimed that the victim pushed him into the wall.  (TT II, 37-42).

Officer Schultz testified that petitioner had no problem understanding questions.  At one point petitioner joked that, because he had been drinking, a good lawyer "could get rid of what he was saying."  (TT II, 44).  Schultz then asked petitioner about the date, the time, and the current President; petitioner gave correct responses to all three questions.  (TT II, 44).

Petitioner's attorney's cross-examination of Officer Schultz included the officer's failure to make a recording of the statement petitioner made at the jail.  (TT II, 45-48).

Lieutenant Randall Weston testified to the *Mirandized* interview he conducted of petitioner.  Petitioner reported that there had been an initial physical altercation inside the residence before Harrington grabbed a bat and took a swing at him.  Harrington was so intoxicated that petitioner simply grabbed the bat and took it away.  Petitioner indicated that when he was swinging the bat at Harrington's head, Harrington had his hands up in a defensive posture.  When this blow landed, it knocked Harrington down into the couch and he stayed there for a minute.  Petitioner reported

that he was surprised when Harrington attempted to get back up.  Petitioner hit him multiple times after that, although he did not know how many.  (TT II, 57-68).

According to Lt. Weston, petitioner described how he attempted to clean up the blood.  He described how he took Harrington's body off the couch and wrapped it up in a sheet of plastic.  Petitioner described the trip to dispose of the bat and the cleaning towels.  He related that, when he returned home in the late afternoon, he duct-taped a heavy tarp around Harrington's body.  (TT II, 68-73).

The cross-examination of Lt. Weston included the fact that the officer failed to record the interview or keep any notes he may have taken during the interview.  (TT II, 75-94, 95-96).

Lt. Weston testified as to how Jeff Berry showed police the location where the bat had been thrown in the river.  Berry also showed the location, about one-quarter mile away, where the material that had been used to cover the bat had been hidden.  (TT II, 53).

Jeff Berry described how he had ended up at Garfield's in Petoskey with petitioner and Harrington.  (TT I, 230).  Harrington became very intoxicated and was also making inappropriate physical advances towards Donna Sauter.  (TT II, 118-19).  Josh Pepin, the bartender at Garfield's, testified that Harrington had been warned about using profanity.  After Harrington grabbed Ms. Sauter's thigh, Pepin took his drink and "sent him on his way."  (TT II, 180).  Petitioner and Harrington left the bar together at around 8:30 or 9:00 p.m.  (TT II, 180).  Ms. Sauter testified that, after

petitioner and Harrington left the bar, she could see them outside pointing fingers at each other. (TT II, 120-21).

Berry testified that he went to pick up petitioner the next morning for work. (TT I, 240). He arrived at petitioner's residence around 7 a.m. (TT I, 241). Petitioner came out to Berry's van and stated that Harrington was dead and that he had killed him. (TT I, 242). Berry went inside and saw the victim's body. (TT I, 244).

Petitioner informed Berry that he had washed some clothes and "burned some stuff" in the fireplace. (TT I, 253). Petitioner brought the baseball bat out to Berry's van and attempted to conceal it by wrapping it "in a plastic and a blanket or sheet or something like that." (TT I, 255). Berry said that he discovered that it was the bat when they were stopped at a gas station and petitioner went to pay for gas. He confronted petitioner by making a remark like "we are getting rid of that bat, it ain't going to be in this vehicle." (TT I, 256). Berry suggested where they could get rid of the bat and the sheets. (TT I, 283).

Berry drove to a remote location outside of Wolverine where there was a dirt road that crossed a bridge over the Sturgeon River. (TT I, 283). They disposed of the bat by throwing it in the river. The sheets, plastic and other materials that petitioner had used to conceal the bat were disposed in another desolate area further down the dirt road. (TT I, 257-58, 284-85).

Berry testified that, when he dropped petitioner back at his residence, the plan was to have petitioner wrap up Harrington's body and that Berry would return in about 45 minutes to help petitioner get rid of it. (TT I, 260-61).

Sue, Jeff Berry's wife, found out that Jeff had not showed up for work that day. She went to petitioner's house and saw her van in the driveway. (TT II, 103). Initially Jeff Berry and petitioner did not answer the door, but eventually Mr. Berry came outdoors. Sue rolled down the car window a few inches, but would not let Jeff inside. She was angry because he had not been at work. (TT II, 104). Jeff Berry tried to explain what had happened, and said something in a low and anxious voice about a murder and the state police, but Sue thought it was just "some line why they didn't go to work." (TT II, 105). Petitioner came outside, and he indicated that he was sorry that they did not go to work. (TT II, 105). Very shortly thereafter, Jeff Berry left and went to the Side Door Saloon, where he called 911. (TT I, 288).

It was against this backdrop that petitioner elected to testify at trial. Petitioner testified that Harrington had been his roommate. Petitioner met with Harrington at Garfield's on the night in question. (TT III, 38-40). Petitioner stated that he was on parole for drunk driving, and that drinking alcohol violated the terms of his parole. (TT III, 41). When the bartender asked Harrington to leave, petitioner left with him. Petitioner estimated that he drank three beers while he was at the bar. (TT III, 46). Petitioner testified that a short distance away from the bar Harrington turned and punched him in the nose. (TT III, 47). According to petitioner, Harrington was accusing

-18-

him of "trying to move in on Donna." (TT III, 47).  Harrington was swearing at him, and that is when petitioner told Harrington that he would have to move out.  (TT III, 48). They walked back to the house.  (TT III, 48).  Harrington went into the living room and petitioner went into the bathroom to clean up his bloody nose.  (TT III, 49).  Petitioner called his best friend Jeff Berry.  (TT III, 51).  Petitioner also spoke with Jeff's wife, Sue, about evicting Harrington.  (TT III, 52).

Petitioner indicated that he was heading towards his bedroom as he exited the kitchen and moved into the living room.  He testified that Harrington shoved him into a wall, and that by the time he got back to his feet, Harrington was coming at him with a baseball bat.  (TT III, 54-56).  Petitioner stated that Harrington took a swing at him, but he was able to grab the bat away from him.  (TT III, 56).  Petitioner testified that he immediately used the bat to hit Harrington, and that Harrington fell backwards and landed on the couch.  (TT III, 58).  Petitioner claimed that Harrington got back up and came after him.  Petitioner testified that he thought Harrington was trying to kill him. (TT III, 59).  Petitioner explained:  "I swung the bat at him and I hit him again, I know I hit him a couple of times, when he came back at me."  (TT III, 59).  When asked why he started cleaning up before the police arrived, petitioner stated: "I don't think I really have much of an answer []."  (TT III, 60).

Petitioner stated that he and Jeff Berry shared a couple of beers while they were trying to decide what to do.  (TT III, 64).  Berry suggested that they get rid of the baseball bat.  (TT III, 64).  Petitioner dropped the bat in a river and hid the sheets.  (TT

III, 65-66).  Then they drove around drinking more beer and visiting members of Berry's family.  (TT III, 67).  They stopped in a bar in Vanderbilt for twenty to thirty minutes and had two more beers.  (TT III, 68).  According to petitioner, they purchased more beer at Four Corners Store in Mitchell.  (TT III, 68).  Petitioner testified that Berry suggested wrapping up the body, and that he indicated he would be back to help petitioner dispose of it.  Berry did not return.  Petitioner found the police outside his house.  (TT III, 69-70).

During cross-examination, petitioner conceded that he had his emotions sufficiently under control to call Jeff and Sue Berry in order to discuss evicting Harrington.  Petitioner indicated that he hit Harrington as hard as he could with the bat and knocked him down.  He admitted that he hit Harrington a couple of times, but denied ever hitting him while he was down on the couch.  Petitioner admitted that he threw the bat into a river.  (TT III, 71-94).

After the close of proofs, the attorneys delivered their closing arguments.  (TT III, 97-135).   Petitioner's attorney argued that petitioner should be found not guilty because he had acted in self-defense.  Alternatively, he argued that petitioner should be found guilty of no greater offense than manslaughter because he had acted in the heat of passion.  (TT III, 112-32).

Judge Johnson delivered the jury instructions.  (TT III, 136-62).  The instructions included petitioner's alternative theories of self-defense and heat of passion.  (TT III, 151-55)..

The jury found petitioner guilty of second-degree murder. (TT III, 165). On October 4, 2005, Judge Johnson sentenced petitioner to 40 to 60 years' imprisonment on his second-degree murder conviction.[3] (Sentencing Transcript (ST), 21-23, ECF No. 21; Judgment of Sentence Commitment to Department of Corrections, found in Michigan Court of Appeals Record, ECF No. 22).

## C.    Appellate Proceedings

Petitioner appealed as of right to the Michigan Court of Appeals. On appeal, petitioner was represented by Attorney Jacqueline McCann of the State Appellate Defender Office. Appellate counsel raised a multi-faceted challenge to the sufficiency of the evidence supporting petitioner's second-degree murder conviction:

> MR. ROSS WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS WHERE HIS CONVICTION FOR SECOND-DEGREE MURDER IS NOT SUPPORTED BY EVIDENCE SUFFICIENT TO ESTABLISH HIS GUILT BEYOND A REASONABLE DOUBT. THE PROSECUTOR FAILED TO DISPROVE BEYOND A REASONABLE DOUBT THAT THE KILLING WAS JUSTIFIED BY SELF-DEFENSE. ALTERNATIVELY, THE PROSECUTOR FAILED TO DISPROVE BEYOND A REASONABLE DOUBT THAT THE KILLING WAS MITIGATED TO MANSLAUGHTER DUE TO THE HEAT OF PASSION BASED UPON ADEQUATE PROVOCATION.

(Defendant-Appellant's Brief at iv, found in Michigan Court of Appeals Record, ECF No. 22). Petitioner raised four additional grounds in a supplemental brief:

---

[3]Petitioner was on parole when he killed Timothy Harrington and he had been drinking in violation of the terms of his parole. (ST, 21). Accordingly, his sentence for murder was "ordered to be served consecutive to and following completion of his sentence for OUIL third, from which he was on parole at the time he committed this offense." (ST, 23).

I.    THE PROSECUTOR FAILED TO PROVIDE DEFENDANT ROSS WITH CRITICAL AND HIGHLY RELEVANT INFORMATION ON EXCULPATORY EVIDENCE OF BLOOD STAIN ON KITCHEN FLOOR, DENYING APPELLANT ROSS HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS (U.S. CONST. AM V, CONST. 1963, ART I § 17).

II.   THE POLICE VIOLATED DEFENDANT ROSS'S 5TH AND 14TH AMENDMENT CONSTITUTIONAL RIGHTS WHEN DEFENDANT ROSS REQUESTED COUNSEL DURING HIS INITIAL INTERROGATION WITH THE POLICE.

III.  THE POLICE AND PROSECUTION SUPPRESSED EVIDENCE, THUS VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS.

IV.  TRIAL COUNSEL FAILED TO GIVE EFFECTIVE ASSISTANCE AND THUS DENIED DEFENDANT ROSS A FAIR TRIAL, VIOLATING HIS SIXTH AMENDMENT RIGHTS.

(Appellant's *Pro Per* Supplemental Brief, found in Michigan Court of Appeals Record, ECF No. 22).

On June 14, 2007, the Michigan Court of Appeals affirmed petitioner's conviction. It found no merit in the grounds raised. (6/14/07 Op., found in Michigan Court of Appeals Record, ECF No. 22). Petitioner sought review of the above-referenced issues in Michigan's highest court. On December 28, 2007, the Michigan Supreme Court denied petitioner's application for discretionary review. (12/28/07 Order, found in Michigan Supreme Court record, ECF No. 23).

**D.    Post-conviction Proceedings**

On October 6, 2008, petitioner filed a motion in the trial court seeking relief from judgment under Rule 6.500 of the Michigan Court Rules. Petitioner sought post-judgment relief on the following grounds:

1.   THE GOVERNMENT OBSTRUCTED JUSTICE BY DESTROYING EXCULPATORY EVIDENCE, DENYING DEFENDANT THE OPPORTUNITY TO RAISE A DEFENSE AND ENABLING THE PROSECUTION TO MISLEAD THE JURY AND GAIN A CONVICTION AS A RESULT. THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THIS EVIDENCE THESE VIOLATIONS DENIED DEFENDANT'S RIGHT TO A FAIR TRIAL AND DUE PROCESS.

2.   DEFENDANT'S CONVICTION WAS OBTAINED THROUGH THE USE OF FALSE AND PERJURED TESTIMONY, KNOWN TO BE SUCH BY THE PROSECUTION, THEREBY DENYING DEFENDANT HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.

3.   THE PROSECUTOR COMMITTED MISCONDUCT BY PAYING THE STATE'S WITNESS, MR. BERRY, BY ALLOWING HIS TO ENTER DEFENDANT'S HOME CRIME SCENE AND REMOVING EVERYTHING, INCLUDING EXCULPATORY EVIDENCE.

4.   THE PROSECUTOR'S MISCONDUCT BY VIOLATING MRE 803(5), AND THE COURT'S ABUSE OF DISCRETION BY ALLOWING THE HEARSAY DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL

5.   THE PROSECUTOR DELIBERATELY ELICITED IRRELEVANT TESTIMONY REGARDING DEFENDANT'S TIME AT A TREATMENT CENTER SOLELY TO PREJUDICE DEFENDANT AND DENY HIS RIGHT TO A FAIR TRIAL.

6.   THE TRIAL COURT COMMITTED INSTRUCTIONAL ERROR BY NOT GIVING A CAUTIONARY INSTRUCTION CONCERNING THE TESTIMONY OF AN ACCOMPLICE.

7.   COUNSEL'S PERFORMANCE FELL BELOW AN OBJECTIVE STANDARD, INCLUDING COMPLETELY FAILING TO SUBJECT THE STATE'S EVIDENCE TO A MEANINGFUL ADVERSARIAL TESTING, AND APPELLATE COUNSEL'S FAILURE TO RAISE MERITORIOUS ISSUES ON APPEAL DENIED DEFENDANT OF HIS

CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

8.     THE CUMULATIVE EFFECT OF ERRORS COMMITTED DURING THE DEFENDANT'S TRIAL REQUIRES RELIEF BECAUSE HE WAS DENIED A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS.

9.     APPELLATE COUNSEL'S INEFFECTIVENESS BY NEGLECTING TO RAISE THESE ISSUES ON DIRECT APPEAL SATISFIES THE "GOOD CAUSE" REQUIREMENT UNDER MCR 6.508A(D).

(Brief in Support of Motion for Relief from Judgment at vi, found in Michigan Supreme Court Record, ECF No. 25).

On January 14, 2009, Judge Johnson denied petitioner's motion for post-conviction relief. (1/14/09 Op., found in Michigan Supreme Court record, ECF No. 25). Judge Johnson found that a number of petitioner's claims of ineffective assistance of trial counsel and his arguments regarding blood stains, photographs, and blood analysis had already been rejected on direct appeal by the Michigan Court of Appeals. (Op. at 3-4, 6). Judge Johnson found that petitioner had not met his burden of showing good cause for his failure to raise all other grounds in his direct appeal and denied relief under Rule 6.508(D)(3) of the Michigan Court Rules. (*Id.* at 6).

Petitioner sought leave to appeal in Michigan's appellate courts. On July 16, 2009, the Michigan Court of Appeals entered an order denying petitioner's delayed application for leave to appeal because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (7/16/09 Order, found in Michigan Court of Appeals record, ECF No. 24). On February 26, 2010, the Michigan Supreme Court

denied petitioner's application for leave to appeal because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (2/26/10 Order, found in Michigan Supreme Court record, ECF No. 25).

On June 20, 2006, petitioner filed his petition for federal habeas corpus relief.  On April 20, 2010, petitioner filed his amended habeas corpus petition.  (ECF No. 7).  In October 2010, respondent filed an answer and the accompanying Rule 5 materials.

<u>Discussion</u>

## I.    Sufficiency of the Evidence

In ground I, petitioner challenges the sufficiency of the evidence supporting his second-degree murder conviction.  (Am. Petition at 6, PageID.58; Petitioner's Brief at 2-4, ECF No. 3, PageID.29-31).  A section 2254 challenge to the sufficiency of evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*; *see Cavazos v. Smith*, 132 S. Ct. 2, 3-4 (2011) (*per curiam*) (*Jackson v. Virginia* "makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.").  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390,

401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n. 16; *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011).

The Michigan Court of Appeals ruled directly on this claim.  Review of this issue must be conducted under the AEDPA standard, which the Sixth Circuit has described as "very deferential."  *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007).  Review of challenges to the sufficiency of evidence under the *Jackson v. Virginia* standard proceeds under the "unreasonable application" prong of AEDPA.  *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). Such an argument is properly understood as an allegation that the state court's decision was the result of an unreasonable application of *Jackson v. Virginia.  See Keys v. Booker*, 798 F.3d 442, 450 (6th Cir. 2015).  In such cases, review "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007).  This standard presents a "nearly insurmountable hurdle" for the habeas petitioner.  *Davis v. Lafler*, 658 F.3d at 534. "Adding to this extremely high bar are the stringent and limiting standards of AEDPA."  *Id.*

The Sixth Circuit has summarized the "double layer of deference" given the state-court decisions in the context of sufficiency-of-the-evidence claims:

Thus, after AEDPA, federal courts reviewing state habeas claims accord a double layer of deference:

-26-

First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, we do not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.

*White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)); s*ee Keys v. Booker*, 798 F.3d at 450.

In the present case, the Michigan Court of Appeals articulated the appropriate standard under *Jackson v. Virginia*. (Op. at 1-2). The Court of Appeals found that the evidence was sufficient to support the jury's verdict finding petitioner guilty of second-degree murder. (*See* Op., 1-2).

Petitioner argues that the decision of the Michigan Court of Appeals was contrary to *Mullaney v. Wilbur*, 421 U.S. 684 (1975). It was not. In *Mullaney*, the Supreme Court determined that requiring a defendant charged with murder to prove by a preponderance of the evidence that he acted in the heat of passion in order to reduce the homicide to manslaughter violated due process. The State of Maine had affirmatively shifted the burden of proof to the defendant. *Id.* at 701. The Supreme Court held "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the

absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id.* at 704.

Here, the burden was never shifted to petitioner to prove any element of the crimes charged. Petitioner was presumed innocent and the prosecution had the burden of proving every element of the crime beyond a reasonable doubt. (TT III, 138). The jury was instructed that the prosecutor was required to prove every element of second-degree murder beyond a reasonable doubt. (TT III, 138, 149-50). This included the requirement of proving that the killing was not justified or done under circumstances that would reduce it to a lesser crime. (TT III, 150). Similarly, with regard to voluntary manslaughter, the prosecutor was required to prove every element beyond a reasonable doubt, including the requisite state of mind. (TT III, 150-52). The instructions regarding self-defense were clear: "The defendant does not have to prove that he acted in self defense. Instead, the prosecutor must prove beyond a reasonable doubt that defendant did not act in self defense." (TT III, 155).

The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998). Malice is defined as the intent to kill, intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *Id.* at 878. Petitioner does not dispute that Timothy Harrington died and that he caused Harrington's death. He argues that the evidence was insufficient to support

the jury's findings beyond a reasonable doubt that he did not act in self-defense, or alternatively, that there was insufficient evidence to support the jury's finding that he acted with malice.

Petitioner is the only living person who witnessed the killing of Timothy Harrington.  The standard for challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319.  It is "the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. at 401-02.

The jury found that petitioner's testimony regarding his state of mind when he killed Timothy Harrington was not credible.  The jury found that petitioner did act with malice when he repeatedly hit Harrington in the head with a baseball bat and caused his death.  The victim's defensive wounds provided additional evidence supporting the jury's factual findings.  The malice element of second degree murder may be inferred from the circumstances of the death.[4]  *See People v. Werner*, 659 N.W.2d 688, 692 (Mich

---

[4]In evaluating a sufficiency of the evidence claim, the Court views both direct evidence and circumstantial evidence in the light most favorable to the prosecution, drawing all available inferences and resolving all issues of credibility in favor of the factfinder's verdict. *See United States v. Rayborn*, 495 F.3d 328, 337-38 (6th Cir. 2007). The reviewing court must presume that the trier of fact resolved conflicting inferences

Ct. App. 2002). There was more than sufficient evidence to find petitioner guilty of second-degree murder.

The decision of the state Court of Appeals upholding the sufficiency of the evidence to support a second-degree murder conviction was not an unreasonable application of the *Jackson v. Virginia* standard. The decision of the Michigan Court of Appeals withstands scrutiny under the double layers of deference to which it is entitled under AEDPA. 28 U.S.C. § 2254(d).

## II.   Due Process

In ground II, petitioner argues that the prosecutor withheld evidence of bloodstains on the kitchen floor, in violation of petitioner's rights under the Fourteenth Amendment's Due Process Clause. He asserts that the police did not attempt to find the starting point of his fight and failed to photograph or analyze apparent blood stains on the kitchen floor. Petitioner claims that his Due Process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated. (Am. Petition at 7, PageID.59; Petitioner's Brief at 4-6, PageID.31-33).

In *Brady   v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Court has

---

of fact in favor of the prosecution, and must defer to that resolution. *See Wright v. West*, 505 U.S. 277, 296-97 (1992).

held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Prejudice and materiality are established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 281 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

   The Michigan Court of Appeals held that petitioner's due process claims were without merit. (Op. at 2-3). This Court finds that petitioner has not shown that the decision of the Michigan Court of Appeals rejecting ground II "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## III.   Police Questioning

   In ground III, petitioner argues that his rights under the Fifth and Fourteenth Amendments were violated when Officer Schultz questioned him at the Emmet County

jail. (Am. Petition at 9, PageID.61; Petitioner's Brief at 6-7, PageID.33-34). The Michigan Court of Appeals rejected petitioner's argument, noting that, in *Connecticut v. Barrett*, 479 U.S. 523 (1987), the Supreme Court had addressed the situation where, as here, the defendant made numerous oral statements to police, but declined to make a written statement without counsel being present. (*See* Op. at 4).

The Michigan Court of Appeals is correct. Petitioner had received *Miranda* warnings and elected not to remain silent. (TT II, 25-44). His unwillingness to provide a written statement without first having it reviewed by counsel was not an unambiguous request for counsel. (TT II, 42-43). That Officer Schultz took the opportunity petitioner voluntarily provided to obtain an oral confession "is quite consistent with the Fifth Amendment." *Connecticut v. Barrett*, 479 U.S. at 529. "*Miranda* gives the defendant a right to choose between speech and silence, and [petitioner] chose to speak." *Id.* The decision of the Michigan Court of Appeals passes review under deferential AEDPA standards. 28 U.S.C. § 2254(d).

## IV.   Due Process Claim based on a Failure to Preserve Interview Notes

In ground IV, petitioner argues that his rights under the Fourteenth Amendment's Due Process Clause were violated because Lt. Weston's interview notes were not preserved. (Am. Petition at 10A, PageID.62; Petitioner's Brief at 7-8, PageID.34-35)(citing *California v. Trombetta*, 467 U.S. 479 (1984)). The Michigan Court of Appeals rejected this argument. (*See* Op. at 3-4). There is no evidence that

anything in Lt. Weston's notes was exculpatory or that the exculpatory value was apparent before the notes were destroyed. *Cf. Trombetta*, 467 U.S. at 488-89.

In *Arizona v. Youngblood*, 488 U.S. 51(1988), the Supreme Court made clear that the government is not required to preserve all evidence that could plausibly be exculpatory during a defendant's trial or sentencing. *Id.* at 58 (noting that the Due Process Clause does not impose "an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution"). Rather, the government violates a defendant's due process rights only where the government acts in bad faith in destroying "potentially useful" evidence. *Id.* ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitutes a denial of due process of law."). Lt. Weston's interview notes were only potentially useful, not exculpatory evidence, and there is no evidence that the State acted in bad faith. *Cf. id.* at 57-58; *accord United States v. Coots*, 408 F. App'x 968, 973 (6th Cir. 2011).

Petitioner's claim fares no better when it is cast as a due process claim based on a failure to record interviews. The Supreme Court has never held that the Due Process Clause requires the recording of police interviews, and lower courts have uniformly held that the Constitution does not require government agents to record witness interviews. *See, e.g., United States v. Rodriguez*, 496 F.3d 221, 224 (2d Cir.2007); *United States v. Houlihan*, 92 F.3d 1271, 1288-89 (1st Cir. 1996); *Hanks v. Palmer*, No. 1:08-cv-192, 2008

WL 2923425, at * 8 (W.D. Mich. July 25, 2008). Accordingly, petitioner is not entitled to habeas corpus relief, as no clearly established Supreme Court holding supports his claim. *See Premo v. Moore*, 562 U.S. at 127.

The decision of the Michigan Court of Appeals rejecting petitioner's due process claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; nor was it an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

## V.    Ineffective Assistance of Counsel Raised on Direct Appeal

In ground V, petitioner reasserts the claims of ineffective assistance of counsel that he raised on direct appeal: trial counsel was ineffective because he failed to hire a pathologist or private investigator; he failed to object to a portion of the prosecutor's closing argument; he failed to move to dismiss the bindover on the first-degree murder charge; and he failed to move for a change of venue. (Am. Petition at 10B, PageID.63; Petitioner's Brief at 8-9, PageID.35-36). The Michigan Court of Appeals determined that each of petitioner's claims of ineffective assistance of counsel lacked merit.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. Petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687-88. A court

considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). On the prejudice prong, "[petitioner] must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because Michigan's courts decided petitioner's claims of ineffective assistance of counsel on the merits, their decisions must be afforded deference under AEDPA. *See Burt v. Titlow*, 134 S. Ct. at 15-18; *Harrington v. Richter*, 562 U.S. at 98-101. To receive habeas relief, petitioner must demonstrate that the state courts' decisions were contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. at 698-99.

Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decisions applied *Strickland* incorrectly. Rather, petitioner must show that the state courts "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012). This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not

satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Woods v. Donald*, 135 S. Ct. at 1376; *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

The question before the habeas court, then, is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 562 U.S. at 123; *see McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015). Petitioner must show that the state courts' ruling on the claim being presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. at 103).

The Michigan Court of Appeals applied the federal standard established in *Strickland* and rejected all petitioner's claims of ineffective assistance of trial counsel. As the Court of Appeals explained, the absence of testimony from a pathologist or private investigator at trial was not evidence that petitioner's trial counsel failed to hire them. (*See* Op. at 5).

The Court of Appeals rejected petitioner's claim that his attorney's failure to object to a portion of the prosecutor's closing argument constituted ineffective assistance of counsel. The prosecutor argued, in relevant part:

The other interesting thing about the whole scenario is guess who gets to tell what happened, the defendant ... because [the victim] is not here to tell his side of the story.

With that in mind, and based upon the wounds that [the victim] has on his body, who is to say that the victim ... did not ... pass out on the couch, and the defendant come in and beat him to death with a baseball bat.

(TT III, 107). Counsel's failure to object did not deprive petitioner of a fair trial. The argument was appropriate and there was no basis for any objection.

As the Court of Appeals explained, the argument was based on reasonable inferences from the evidence:

[T]he victim's postmortem blood alcohol level was .23. An expert testified that blood was found "on basically all four walls around the couch." He also stated that the blood on the couch, including a pooling of blood beneath a cushion, and hair "found on the back rest of the couch" indicated that the altercation had taken place "in and around the couch on that one side of the couch." He also noted that police "did not find anything in the living room that was specifically broken." While defendant did testify that the victim was conscious and fighting with defendant when defendant struck him with the bat, the prosecutor's argument was still a reasonable inference based on the evidence.

(Op. at 6). Even assuming that the argument had been improper, any error in this regard was harmless: "the trial court properly instructed the jury that the attorney's arguments were not evidence, and "jurors are presumed to follow their instructions[,]" (*Id.*) (citing *People v. Graves*, 458 Mich. 476, 486; 581 N.W.2d 229 (1998)).

The Court of Appeals determined that there was sufficient evidence of premeditation to establish probable cause to bind over petitioner for trial on the first-degree murder charge. Petitioner's attorney's failure to make a meritless motion was not ineffective assistance of counsel:

> There can be no reasonable probability that requesting a dismissal would have made any difference, *Rodgers*, *supra* at 714, because the jury found defendant guilty of second-degree murder, rejecting the first-degree murder charge. In any event, the violence of the assault, including the presence of the defensive forearm wounds and multiple severe skull fractures, the pattern of the bloodstains, and the victim's blood alcohol level support a finding that defendant acted with premeditation, and thus sufficient probable cause existed for the bindover on first-degree murder.

(Op. at 6).

The Michigan Court of Appeals rejected petitioner's claim that his trial attorney had been ineffective in failing to move for a change of venue:

> Finally, defendant argues that the defense counsel should have requested a change of venue to another county because the incident occurred in a small community, the victim had family members on the local tribal counsel, a local Native-American Casino was the largest employer in the community, and local media reports of the incident were factually inaccurate. Given defendant's lack of record evidence to support his allegations, defendant "has not shown the existence of a strong community feeling against him or publicity so extensive and inflammatory that jurors generally could not remain impartial." *People v Lee*, 212 Mich App 228, 253; 537 NW2d 233 (1995). Thus, the lack of a request for change of venue is not an error that is apparent from the existing record. *Nantelle*, *supra* at 87.

(Op. at 6). This Court finds that the decision of the Michigan Court of Appeals rejecting petitioner's claims of ineffective assistance of trial counsel withstands scrutiny under the doubly-deferential AEDPA standard of review. 28 U.S.C. § 2254(d).

## VI. Grounds Raised In Motion for Post-conviction Relief

Petitioner's ground VI consists of the grounds he raised in his Rule 6.500 motion. (Am. Petition at 10B-10C, PageID.63-64; Petitioner's Brief at 9-14, PageID.36-41). Judge Johnson denied all the claims that petitioner attempted to reassert after the Court of Appeals had rejected them on direct appeal. (1/14/09 Opinion at 3, 4, 6, found

in Michigan Supreme Court record, ECF No. 25). Judge Johnson found that petitioner had not met his burden of showing good cause for his failure to raise all other grounds in his direct appeal, and he denied relief under Rule 6.508(D)(3) of the Michigan Court Rules. (*Id.* at 6). Although procedural default would provide another basis for rejecting these grounds, the Court rejects them for lack of merit.

A.   Destruction of Exculpatory Evidence

Petitioner argues that the prosecution committed a *Brady* violation by allowing the destruction of exculpatory evidence, depriving him the opportunity to raise a defense and enabling the prosecution to mislead the jury and to obtain a conviction in violation of his dues process rights. (Brief in Support of Motion for Relief from Judgment at 2-8). Petitioner argues that there were blood stains inside his residence that were not preserved. For example, he argues that the blood stains on the couch were not properly tested or preserved. Petitioner argues that there is no way to tell whether the blood belonged to him or the deceased, and the prosecution's photos gave the false impression that it was solely the blood of the deceased.

The evidence indicates that petitioner hit Timothy Harrington in the head multiple times with a bat. Timothy Harrington died from those wounds. Petitioner testified that he hit Harrington as hard as he could with the bat and that Harrington fell backwards and landed on the couch. (TT III, 58, 74). He hit Harrington "a couple of times" after that, but could not recall the exact number. (TT III, 59-60, 76). Petitioner did not offer any testimony claiming that he bled on the couch.

The pooled blood stains on the couch were in the area below the cushion.  (TT I, 208; TT II, 140).  This indicated that "there was a source of blood that had been there for some time."  (TT II, 142).  Lt. Weston testified that petitioner described how he attempted to clean up the blood.  Petitioner described how he took Timothy Harrington's body off the couch and wrapped it up in a sheet of plastic.  Petitioner later added a heavy tarp and used duct tape to secure it around Harrington's body.  (TT II, 68-73).  Suffice it to say there is no evidence before this Court that the prosecution withheld or destroyed exculpatory blood stain evidence.

Petitioner testified.  Thus, he had a more than adequate opportunity to apprise the jury of any blood stain evidence that he believed was attributable to him rather than Timothy Harrington's massive head injuries.

The prosecution's arguments based on the evidence were not misleading.  They were based on reasonable inferences.

Petitioner's argument that the admission of Exhibits 1 through 69 into evidence was erroneous (Brief in Support of Motion for Relief from Judgment at 7) requires no discussion beyond an observation that it is not a basis for federal habeas relief.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry into whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas

review of a state conviction" because "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.

   B.    <u>Prosecutorial Misconduct</u>

   Petitioner argues that various instances of prosecutorial misconduct deprived him of a fair trial.  The scope of review in a habeas action regarding allegations of prosecutorial misconduct is narrow.  "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This court does "not possess supervisory powers over state court trials." *Id.*  "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.* "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (" '[T]he appropriate standard of review for ... a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012); *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).

   1.    Knowing Use of Perjured Testimony

   In ground VI(B), petitioner argues that the prosecutor knowingly used false testimony provided by Jeff Berry.  Petitioner points to excerpts from Berry's preliminary

examination testimony regarding telephone conversations involving petitioner on the night Timothy Harrington was killed. He argues that Berry's phone bill was consistent with his preliminary examination testimony and inconsistent with Berry's trial testimony. He argues that Berry's memory was much clearer at the preliminary examination, and he compares Berry's preliminary examination testimony to a portion of a police report. He argues that Berry's recollection of his discussion with petitioner about fleeing to Canada was inaccurate. He argues that Berry "is covering something up. He does not want the court to know his involvement in the case" because there were "seemingly minor" inconsistencies in Berry's preliminary examination testimony and his trial testimony regarding finding the bat inside the van. Petitioner argues that the only way Mr. Berry's trial testimony could have been truthful was if it was "in synch with" a prior statement he made to Lt. Weston. (Brief in Support of Motion for Relief from Judgment at 9-15).

None of the above-referenced instances indicate that the prosecutor knowingly used perjured testimony from Berry. Moreover, Berry's trial testimony was subject to extensive cross-examination, and his trial testimony was favorable to petitioner in avoiding a first-degree murder conviction. Berry conceded that he had a history of a closed head injury stemming from a car accident and he did not have a good memory. (TT I, 266-67). He and petitioner were friends. Berry knew petitioner well and the two men worked and drank together. (TT I, 267,278, 295). Berry was certainly not a hostile witness. Petitioner's attorney questioned Berry about the phone calls from petitioner.

(TT I, 270-71, 275). He questioned Berry about the discovery of the bat inside the van. Berry testified that it was his idea to get rid of the bat and the materials that had been covering it. Further, Berry admitted selecting the locations to dump these items. (TT I, 282-85).

Petitioner's attorney used the preliminary examination testimony to refresh Berry's memory regarding the suggestion of flight. Berry then testified to the effect that when he suggested the possibility that petitioner could flee to Canada, petitioner's response was that running would only make things worse. (TT I, 289). Berry even testified that it was he who had suggested wrapping up Harrington's body so that it could be hidden at Berry's place in the trunk of a car. Berry testified that petitioner had never asked to use his van to dump the victim's body. (TT I, 290). Berry testified that the 911 recording indicating that he had been a witness to a murder around 4 a.m. that morning was not accurate. Berry attributed his inaccurate description of being a witness to a murder to being nervous and his alcohol consumption. (TT I, 292-93). Petitioner's attorney elicited testimony from Berry that he was testifying under an immunity agreement, and that he would not be prosecuted for his actions as long as he gave truthful testimony. (TT I, 283).

        2.     Paying Jeff Berry and Allowing him to Enter Petitioner's Residence

In ground VI(C), petitioner claims prosecutorial misconduct in paying Jeff Berry and allowing him to enter petitioner's residence to remove purportedly exculpatory

evidence. Berry testified at petitioner's trial under a limited grant of immunity. (TT II, 265, 283). There is no evidence that he was "paid" for anything. Petitioner's only record cite in support of this argument is "TT I, 83," which is an excerpt from the jury selection process. (Brief in Support of Motion for Relief from Judgment at 16). Ground VI(B) is devoid of factual support and it requires no further discussion.

### 3. Rule 803(5) of the Michigan Rules of Evidence

Petitioner's next claim of prosecutorial misconduct appears in ground VI(D). He points to Berry's testimony: "I am pretty sure I remember what I testified"; and he argues that the prosecutor violated Rule 803(5) of the Michigan Rules of Evidence by attempting to sneak in hearsay by purporting to refresh Berry's memory. (*See* Brief in Support of Motion for Relief from Judgment at 17-18 (erroneously citing "TT I, 243"; the correct cite is TT I, 248)). The quoted excerpt must be viewed in context. It was preceded by the prosecutor's questions to Berry about what petitioner had reported happening immediately after the first time petitioner hit Harrington with the bat. Berry initially testified that he was not sure. Berry then indicated that he was not sure what happened in relation to petitioner's phone call. The prosecutor once again tried to get Berry to focus on what petitioner had reported happening immediately after Harrington was knocked down. At this point, Berry then gave a response which suggested that Berry may have been on the telephone with petitioner at the moment Harrington began to get up: "Well, I believe that Tim got, that Brad was either on the phone with me, and Tim got back up and come after Brad again a second time." (TT I, 248).

It was at that point that the prosecutor attempted to refresh Berry's memory with an excerpt of his testimony found on page 72 of the preliminary examination transcript. (TT I, 249-50).   No objection was made to this line of questioning.   (TT I, 24-50). Although petitioner claims prejudice, Berry's responses were favorable to petitioner in that they suggested that petitioner had refrained from hitting Harrington a second time until after Harrington got up and came after him again.   There is no evidence of prosecutorial misconduct, much less misconduct that deprived petitioner of a fair trial. The purportedly improper admission of evidence under the Michigan Court Rules is not a basis for federal habeas corpus relief.   28 U.S.C. § 2254(a).

4.     Jeff Berry's Reference to Meeting Petitioner in a Treatment Center

In ground VI(E), petitioner argues that the prosecutor committed misconduct and deprived him of a fair trial because he asked Jeff Berry where he met petitioner, and that question had already been asked and answered during the preliminary examination hearing.   (Brief in Support of Motion for Relief from Judgment at 19 (first page so numbered)).   Asking Berry questions at trial about how he and petitioner knew each other and the nature of their relationship (TT I, 219-20) was manifestly appropriate.   Berry's passing reference to having been in a "treatment center" with petitioner "around 2000" was harmless.

*Voir dire* questioning had been designed to identify jurors who would be able to put aside the facts that petitioner had multiple drunk driving convictions and was drinking in violation of the terms of his parole on the night in question, would be able

to focus on the specific criminal charges against petitioner for killing Timothy Harrington and the evidence related to those charges, and would follow the judge's instructions regarding the law. (TT I, 77, 101-04, 125-31).   Petitioner's attorney's opening statement indicated that the jury would be hearing about petitioner's attempts to put his life back together after his release from prison. (TT I, 169-70).  Petitioner's status as an individual who had been drinking in violation of the terms of his parole was offered as a reason why petitioner did not contact police immediately after he killed Harrington and took a series of actions with regard to physical evidence. (TT I, 177-78). The jury heard the recorded statement petitioner gave to the police.  (TT I, 179).

Petitioner elected to testify.  He told the jury  about his alcohol use (TT III, 38-39), and that he was not supposed to be drinking while he was on parole (TT III, 40-41). He testified that he did not trust the police because he had been sent to prison for drunk driving.  He decided not to contact the police after killing Timothy Harrington because he was afraid the police would not believe what had happened. (TT III, 61).  Petitioner's claims of prosecutorial misconduct are meritless.

Even assuming petitioner's claim of prosecutorial misconduct had merit, there was no due-process violation.  The evidence against petitioner was overwhelming.  None of the purported instances of misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 132 S. Ct. at 2153.

C.    Jury Instructions

-46-

In ground VI(F), petitioner argues that the trial court committed instructional error by not giving a cautionary instruction concerning the testimony of Jeff Berry. Petitioner cites *People v. McCoy*, 392 Mich. 231, 240 (1974),[5] and he argues that an accomplice instruction should have been given because "[t]he prosecution based its entire case around this witness-accomplice's hearsay testimony." (Defendant's Brief in Support of Motion for Relief from Judgment at 20-21).

Petitioner's argument is meritless. The prosecution did not base its entire case on Berry's testimony. Even assuming that Berry had never testified, the other evidence presented at trial would have provided more than adequate support for the jury's verdict. Petitioner testified that he killed Timothy Harrington and he made no mention of Jeff Berry being present or helping him kill Harrington. (TT III, 58-61). Petitioner testified that Berry was not involved in killing Timothy Harrington. Berry only found out about it the next morning when he came to pick up petitioner for work. (TT III, 61-63).

There was no basis under Michigan law for giving an instruction regarding the testimony of an accomplice. Murder is distinct from the criminal offense of being an accessory after the fact. "[T]he common law offense of accessory after the fact is not in the same class or category as murder. Plainly, the purpose of the murder statute is to protect human life and prohibit wrongful slayings. By contrast, an accessory after the

---

[5]Petitioner's reliance on *People v. McCoy* is misplaced. *McCoy* was overruled by *People v. Young*, 693 N.W.2d 801 (Mich. 2005).

fact is one who with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment. The crime of accessory after the fact is akin to obstruction of justice." *People v. Perry*, 594 N.W.2d 477, 481 (Mich. 1999) (citations and quotations omitted); *see People v. Lucas*, 262 N.W.2d 302 (Mich. 1978) (Aiding and abetting under Michigan law does not include an accessory after the fact.).

Even assuming that there had been a basis for giving an accomplice instruction, the absence of such an instruction would not provide a basis for federal habeas corpus relief. Federal habeas corpus relief does not lie for errors of state law. *See* 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. at 71-72.

D.    Ineffective Assistance of Counsel

Ground VI(G) consists of a long list of claims of ineffective assistance of counsel that petitioner raised in his Rule 6.500 motion. The claims that were considered and rejected by the Michigan Court of Appeals have already been addressed. The new claims of ineffective assistance of trial counsel that petitioner raised in his 6.500 motion were as follows: failure to file a motion to dismiss or suppress on the ground that the government had destroyed exculpatory evidence  (Brief in Support of Motion for Relief from Judgment at 23-24); failure to adequately expose, explore and impeach Jeff Berry's testimony through cross-examination regarding his purported receipt of  $70,000 in property from petitioner and the 911 tape in which Berry stated that he "watched a guy get murdered this morning in the City of Petoskey" (*Id.* at 24-25); failing to object to the

prosecutor's alleged violation of Rule 803(5) of the Michigan Rules of Evidence (*Id.* at 25); failure to object to the alleged knowing use of perjured testimony by the prosecutor; (*Id.* at 25-26); failure to object to the prosecutor's questions regarding how Berry knew petitioner (*Id.* at 26); stipulating to the admission of evidence (*Id.* at 26-27); failure to file a motion to suppress petitioner's post-arrest statement (*Id.* at 27-28); denying petitioner his right to have Attorney Kwiatkowski act as co-counsel (*Id.* at 28-30); compelling petitioner to testify at trial (*Id.* at 30-31); introducing the fact that petitioner was on parole when he killed Timothy Harrington (*Id.* at 32); failure to investigate or call a medical expert witness to establish that petitioner was "physically deficient" (*Id.* at 32-33); failure to request an instruction regarding accomplice testimony (*Id.* at 33); failure to adequately cross-examine the prosecution's expert witness on the issue of Timothy Harrington's defensive wounds (*Id.* at 33-34); failure to challenge an allegedly biased juror (*Id.* at 34-36); and continuing to represent petitioner despite a purported conflict of interest stemming from his representation of members of the Little Traverse Band of Odawa Indians (*Id.* at 36-37).  Petitioner alleges that appellate counsel was ineffective in failing to raise on direct appeal all the issues that petitioner subsequently raised in his Rule 6.500 motion.  (*Id.* at 37-38).

As previously noted in the discussion of the claims of ineffective assistance of counsel raised on direct appeal, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. at 687-88.  There is a "strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance." *Id.* at 689. Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). On the prejudice prong, the court focuses on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. at 372. "[T]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

There is no evidence that the government destroyed exculpatory evidence. There was no legal or factual basis for objecting to any of the other instances of alleged prosecutorial misconduct. There was no legal or factual grounds for requesting an accomplice instruction. Counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 505-06 (6th Cir. 2007). Because the underlying claims lack merit, counsel's failure to object was neither erroneous nor prejudicial.

The decisions not to move to suppress petitioner's recorded statement, not attempting to further impeach Berry on the basis of his statements to the 911 operator that he "watched a guy get murdered" or his purported receipt of funds generated from petitioner's property, stipulating to the admission of evidence, not attempting to keep petitioner's status as a parolee from the jury, not obtaining and calling expert witness

to testify regarding petitioner's physical condition, and not conducting a more lengthy cross-examination of the prosecution's expert regarding the victim's defensive wounds were all matters of sound trial strategy.

Police found petitioner at his residence with Timothy Harrington's bludgeoned corpse wrapped in plastic and a tarp on petitioner's living room floor. (TT I, 194-96). Petitioner's fingerprints were on the duct tape which had held the tarp in place around the victim's body. (TT II, 162, 166). Petitioner's left footprint was found on the plastic sheet under the tarp. (TT II, 163, 166). Although petitioner now believes, with the benefit of hindsight, that his attorney should have moved to suppress the evidence of the statement(s) that he gave to the police, petitioner has not identified any legal basis on which his recorded statement could have been suppressed. Petitioner did not unambiguously invoke his right to counsel. The defense strategy was to use petitioner's recorded statement as part of the explanation for his actions, and through cross-examination, to undermine the effectiveness of the oral statements by emphasizing that they were not recorded.

Petitioner's attorney was able to elicit favorable testimony from Jeff Berry, which, in all likelihood, saved petitioner from the non-parolable life sentence that would have resulted from a first-degree murder conviction. Berry testified that destroying evidence related to the killing had been his idea. He provided testimony that offered an explanation other than that petitioner had wrapped up Harrington's body for immediate disposal. Berry indicated that the possibility to petitioner fleeing to Canada had been

Berry's idea. Petitioner's attorney was able to elicit testimony from Berry conceding that his statement on the 911 tape, which indicated that he had witnessed a murder, was not accurate. (TT III, 291-92). Additional cross-examination regarding Berry's report to the 911 operator that he had witnessed a murder posed the risk that jury might focus on that report, accept it, and reject the versions of events that Berry and petitioner described in their testimony.

Petitioner argues that trial counsel was ineffective in stipulating to the introduction of "erroneous DNA evidence." (Brief in Support of Motion for Relief from Judgment at 26-27) (citing TT II, 196). Petitioner's attorney stipulated to the admission of Exhibit 85, which is described as a "DNA analysis done by a technician with the last name of Milligan."[6] (TT II, 196-97). The DNA analysis showed that the blood on petitioner's right boot, blood crusts from hair recovered from a sheet, and a "[s]tain from hairs from couch" all matched Tim Harrington's DNA.

Petitioner has not shown that the DNA evidence was erroneous. Stipulating to the admission of this evidence by petitioner's attorney did not fall below an objective standard of reasonableness and did not prejudice petitioner resulting in an unreliable or fundamentally unfair outcome.

Petitioner claims that his counsel's comment during the jury selection process, to the effect that petitioner would take the stand, "compelled" him to testify. (Brief in

_____

[6]A copy of Exhibit 85 is found within Appendix A to Petitioner's Brief in Support of Motion for Relief from Judgment.

Support of Motion for Relief from Judgment at 31) (citing TT I at 101-02).  But, he does not assert that he would not have otherwise testified.  He claims, instead, that he told his attorney he did not want to testify unless it became absolutely necessary.  Petitioner cites to the defense's proposed jury instructions, filed a week before trial, in which he had "reserved" the right not to testify.  (*Id.*) (citing Appendix F).  Petitioner's failure to offer any basis for finding that the result of the trial would have been different, had his counsel not made the statement during jury selection, precludes a finding of prejudice, as required by *Strickland.  See* 466 U.S. at 687-88.

Moreover, the evidence against petitioner was overwhelming.  It was readily apparent that his state of mind would be pivotal.  The jury was going to be instructed that petitioner's state of mind could be inferred from the kind of weapon used, the type of wounds inflicted, the acts and words of petitioner, and any other circumstances surrounding the alleged killing.  (TT I, 152).  Premeditation and deliberation could be inferred from any action of the petitioner which showed planning or from any other circumstances surrounding the killing.  (TT I, 153).  The jury was going to learn about petitioner's role in the concealment and destruction of evidence after Timothy Harrington had been killed.

Petitioner's attorney asked one question during *voir dire* that indicated that petitioner would testify.  (TT I, 101-02).  His attorney's opening statement certainly left open the possibility that petitioner might not testify.  Counsel indicated that the jury would hear the statement that petitioner gave to the police "immediately after this

happened." (TT I, 175). The opening statement was couched in terms that the jury would hear from petitioner, not that the petitioner would be taking the witness stand and testifying as to what happened. (TT I, 167-82).

Petitioner's counsel's performance did not fall below an objective standard of reasonableness. Further, petitioner has not shown that counsel's purportedly deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome.

Petitioner's argument that his attorney was ineffective in failing to call a medical expert to establish that he was not in good physical health on the night he killed Timothy Harrington (Brief in Support of Motion for Relief from Judgment at 32-33) requires little discussion. Petitioner was able to grab the bat and take it from Harrington. (TT III, 56, 73). Petitioner was then able to wield the bat and kill him. (TT III, 58-60, 73-79). In addition, petitioner had been sufficiently robust to perform outside construction work during the winter in Northern Lower Michigan. (TT III, 40, 79). Petitioner was not intoxicated. (TT III, 46-47, 89-90). Petitioner testified and offered the jury his explanation for his actions. Notably absent from his testimony were assertions that Harrington had been much bigger and stronger or that any physical impairment or "fragile state" played a role in petitioner's his decision making process.

Petitioner's attorney was not ineffective in failing to call a medical expert. No medical expert testimony could establish that petitioner lacked the physical ability use a bat to kill Harrington.

Petitioner argues that his trial counsel was ineffective because he failed to adequately cross-examine Dr. Start regarding the defensive wounds on Timothy Harrington's body. Petitioner believes that an effective cross-examination would have established that a "person can receive the same type of wounds while being the aggressor." (Brief in Support of Motion for Relief from Judgment at 33-34).

There is no evidence supporting petitioner's belief. Among other things, counsel's cross-examination established that Dr. Start could only tell from aspirated blood that Harrington did not die instantly, but he could not quantify exactly how long. (TT III, 27). Dr. Start could tell that the Harrington was hit by multiple blows, but could not say exactly how many. (TT III, 36-37). Given the extent of the victim's forearm injuries (TT III, 9-10, 15) and petitioner's testimony that his initial blow was as hard as he could swing the bat (TT III, 74, 78), petitioner faced an uphill battle convincing the jury that Timothy Harrington posed any real threat when, and if, he got up again. (TT III, 99, 104, 108-09).

Petitioner's attorney was able to present a compelling argument that petitioner should not be found guilty of first-degree murder because there was inadequate evidence of premeditation, but he could not convince the jury on the present record to find petitioner not guilty by reason of self defense, or only guilty of manslaughter by

reason of sudden heat of passion. Petitioner's attorney's cross-examination of Dr. Start did not fall below an objective standard of reasonableness and the purportedly deficient cross-examination did not prejudice the petitioner resulting in an unreliable or fundamentally unfair outcome.

Petitioner argues that trial counsel was ineffective because he did not seek removal of a particular juror. (Brief in Support of Motion for Relief from Judgment at 34-36). Counsel is accorded particular deference when conducting *voir dire*. "An attorney's actions during *voir dire* are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Further, because this claim of ineffective assistance of counsel is founded on a claim that counsel failed to strike a biased juror, petitioner must show that the juror was actually biased against him. *See Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001); *see also Hughes*, 258 F.3d at 458. Petitioner falls well short of the mark.

This juror's father had been killed in Canada by a drunk driver. (TT I, 59-60). The juror indicated that he would not be envisioning his father's killer if petitioner took the witness stand. The juror volunteered that his history included overcoming his own problems with drugs and alcohol. He stated that he worked with recovering alcoholics "all the time." (TT I, 103-04; *see also* TT I, 77). He worked for the Bay area Substance Education Service. (TT I, 42). The juror was not biased against petitioner and he appeared favorably disposed towards individuals struggling with their alcohol use. In addition, the juror's responses to questions indicated that he understood that petitioner

was presumed innocent and that the prosecutor had the burden of presenting evidence establishing his guilt. (TT I, 88-89). Electing not to seek removal of this juror was a strategic choice,[7] well within the wide range of reasonable professional assistance, and it did not prejudice the petitioner resulting in an unreliable or fundamentally unfair outcome.

Petitioner argues that Attorney Klawuhn had a conflict of interest because he had been hired to perform legal work for the Little Traverse Band of Odawa Indians and Timothy Harrington had been a member of the tribe. (Brief in Support of Motion for Relief from Judgment at 36). In order to demonstrate that a conflict of interest violated his Sixth Amendment rights, petitioner "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *Diaz v. Howes*, No. 1:09-cv-610, 2015 WL 869174, at * 20 (W.D. Mich. Feb. 27, 2015). Petitioner has not demonstrated an actual conflict of interest, much less that such a conflict adversely affected his lawyer's performance.

Petitioner argues that his appellate counsel was constitutionally ineffective in failing to raise the issues that petitioner later raised in his motion for post-conviction relief. Claims of ineffective assistance of appellate counsel are measured under the

---

[7]Where it was appropriate, petitioner's attorney sought and obtained removal of a prospective juror where that individual's responses during *voir dire* indicated that he would not be able to render a fair and impartial verdict because he could not put aside the fact that petitioner was drinking alcohol in violation of the terms of his parole and decide the charges against petitioner based on the evidence presented and the judge's instructions regarding the law. (TT I, 129-31).

standards established by the Supreme Court in *Strickland*. *See Evitts v. Lucey*, 469 U.S. 387 (1985). In the case of appellate counsel, petitioner has no constitutional right to have every nonfrivolous issue raised on appeal. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). Appellate counsel acts within the fair range of professional assistance when counsel chooses not to assert weak or unsupported issues on appeal. *See Smith v. Murray*, 477 U.S. 527, 536 (1986). Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel. *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy." *Smith v. Murray*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. at 751-52). Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

To overcome the presumption of competence of appellate counsel in these circumstances, petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert. *Id.*; *see Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012) (Petitioner "must show the issues his appellate counsel failed to raise were 'clearly stronger' than the issues his counsel did raise – and that the state court lacked a reasonable basis for believing otherwise."). As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and

"[petitioner] must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Consequently, counsel's failure to raise an issue on appeal is ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005).

The issues petitioner raised in his motion for post-conviction relief were meritless. They were not clearly stronger than the issues raised by appellate counsel. There is no reasonable probability that inclusion of those issues would have changed the result of the appeal.

E.   Cumulative Effect

In ground VI(H), petitioner argues that the accumulation of errors in the trial and appellate proceedings rendered his conviction fundamentally unfair. Under settled Sixth Circuit authority, a claim that the cumulative effect of errors rendered a trial fundamentally unfair is "not cognizable" after AEDPA. *See Shepard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *Moore v. Parker*, 425 F.3d 220, 256 (6th Cir. 2005); *accord Haunch v. Berghuis*, 469 F. App'x 418, 422 (6th Cir. 2012). "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Delo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Maryland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012). Moreover, because the individual claims are without merit, petitioner cannot show that any cumulative

error violated his constitutional rights.  *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

## VII.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.   A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.*   Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDonnell*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the Court has examined each of petitioner's claims under the *Slack* standard.

Petitioner cannot demonstrate that reasonable jurists would find that the denial of habeas corpus relief on each of the grounds raised in his petition is debatable or wrong.  *See Slack*, 529 U.S. at 484.  Accordingly, the Court will be entering an order denying petitioner a certificate of appealability.

-60-

## <u>Conclusion</u>

For the foregoing reasons, a judgment will entered dismissing the petition with prejudice because it does not provide a basis for federal habeas corpus relief under 28 U.S.C. § 2254.


Dated:   August 23, 2016                    <u>/s/ Paul L. Maloney</u>
                                            Paul L. Maloney
                                            United States District Judge